[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Phil Lodovico was the masonry subcontractor (the sub) and Bob Tabacco the general contractor (the general) on a building restoration project for the Barnes Group. The contract price was $65,000, but none of the CT Page 6585 terms of the agreement were reduced to writing. This is the sub's action for an unpaid portion of the contract price as well as for the cost of certain work he performed, he claims, in addition to what was required by the contract (the extras). The general has counterclaimed, alleging that the sub was unable to perform the contract on time, and that the general was required to hire two other subcontractors to do so, at a cost in excess of the contract price. The general also denies the sub's right to payment for three of the extras he claims.[1]
I heard testimony on three days in October and December 1999. Both parties testified, as well as the individual at the Barnes Group who entered into the building restoration contract with the general. This memorandum represents my findings of fact and conclusions of law based on the testimony of the witnesses, including my assessment of their credibility, as well as the exhibits which were introduced.
The sub entered into his performance on April 23, 1998, less than a week after the general signed his contract with the Barnes Group, and worked steadily on the project until early July[2], when he told the general that he had to leave the job for two-four weeks to finish work on another job.[3]
The contract between the general and the Barnes Group called for a completion date of September 4, 1998.[4] The general, however, told the sub that the completion date was August 28. This was the first time any completion date had been given to the sub. Upon being told this, the sub promised to return by August 10 with a second mason and meet the August 28 date.[5] Rejecting this assurance from the sub, the general told him to remove his equipment from the job site by August 4[6] and proceeded to hire two other subcontractors to complete the job.
This case falls squarely within the rule of Valente v. Weinberg,80 Conn. 134, 135 (1907): "If the plaintiff, without fault on his part, was prevented by the defendant from completing the contract, he could treat it as rescinded and recover, quantum meruit, for the work and labor performed under it, or he could bring his action for damages against the defendant for breaking the contract and preventing the plaintiff's performance of it." Accord: Greco v. Morcaldi, 145 Conn. 685, 690 (1958);Martin v. Kavanewsky, 157 Conn. 514, 520 (1969). Here, the sub stood ready and, to all appearances, able to complete his work within the time period established by the contract. Although the general claimed that the sub's absence from the site for two-four weeks, beginning on or about July 17, would interfere with his ability to complete the project on time, it is significant to me that, according to the general's own testimony, he did not have his substitute masonry subcontractors begin work on the project until after August 4, two weeks after the sub left CT Page 6586 the job and only a few days before the sub told him he would return to the project with extra help to finish on time.
In addition to his claim for the value of the work he had done on the building under the contract, the sub seeks compensation for five extras. The general does not dispute his right to payment for two of these claims. See footnote 1, supra.
The most substantial of the three remaining claims is one for $2300 for framing two large window openings.[7] Essentially, this boils down to a dispute whether the sub's contract price of $65,000 included work on 22 or 24 windows on one side of the building. It is undisputed that the original plans (Exhibit N) which were given to the sub by the general, and on which the sub based his original bid, indicated that there were 22 windows to be done. The general testified, however, that the Barnes Group and he agreed to modify the plans to increase the number of windows to 24, that he told the sub of this modification, and that the contract price included the 24 windows.
The general's claim that he told the sub that the number of new windows had changed from 22 to 24 is corroborated by Exhibit 9, a proposal for extra costs he submitted to the Barnes Group in November 1997, after the initial bids of the sub had been prepared. It is unlikely that he would have submitted this proposal without having agreed on the extra costs with the sub.
An additional problem with the sub's claim is that there is no basis in the evidence for the amount of $2300 he claims as the cost of this extra. While he testified that $50 an hour was the price the general agreed to pay for extras, he acknowledged that there was never any explicit agreement to that amount; moreover, his bill for this extra does not demonstrate how that $50 an hour price would have led to a total cost of $2300. It is the sub's burden to provide the court with evidence as to the amount of his damages. Since he has failed to do so, and because the evidence supports the conclusion that the contract price included an amount for this change, this claim must be denied.
With regard to the two remaining extras[8], considering all of the testimony, including the testimony of the Barnes Group official who negotiated the general's contract and oversaw performance, the sub has failed to meet his burden of proving that these charges were for extras rather than to correct errors he, himself, had made.
In view of the foregoing, judgment shall enter for the plaintiff on the complaint in the amount of $6,899.50. Judgment shall enter for the plaintiff on the defendant's counterclaim. CT Page 6587
BY THE COURT
Shortall, J.